# EYRE-SHOEMAKER CONSTRUCTION COMPANY
## *vs.* MACKIN.

*Master and servant; hoisting engine; contributory*
*negligence of servant; of fellow-servant; duty*
*of servant.  Prayers: inconsistent.*

In actions of damages for losses sustained by the plaintiff because of the negligence of the defendant, the foundation of the right of recovery lies in some act of negligence, both of commission or omission, on the part of the defendant or his omission of some duty owed by him to the plaintiff.     p. 60

When an employee while engaged in his duties receives injuries from dangers which are open and obvious, he is presumed to have assumed the risk, and no claim for damages will lie by him against his employer.                p. 62

Where an employee brings suit for damages for injuries claimed by him to have been received from a defect in the machinery, it is not sufficient to show that the injury was received because of such defect, but he must also show that it happened because the employer did not exercise care in the premises.                                                        p. 63

It is not negligence *per se* for a hoisting engine to be used in the open, without shelter or cover, when they are frequently so used and are built especially for that purpose.         p. 63

Neither is it negligence for the employer not to keep in repair the foot brake upon a hoisting engine when it is shown that the foot brake was not an integral part of the engine, but was always an extra, and the engine was equipped with a friction brake.                                                         p. 64

The failure of the engineer to apply the brake was the fault of a fellow-servant of the plaintiff, for which there could be no recovery as against the employer.                    p. 64

In an action for damages for injury received by the plaintiff while working about the hoisting engine there was some evidence that the injury was caused by the condition of the machinery and some that it was caused by the contributory negligence of the engineer, a fellow-servant, in not heeding

the signals of a signalman, placed by the company to direct the movements of the engine; a prayer instructing the jury that there was no negligence proved on the part of the defendant is proper.                                                    p. 66

The granting of a prayer on behalf of the plaintiff that in the use of certain machinery the defendant must exercise "a *higher* degree of care where life and limb is in danger than in other cases," together with a prayer of the defendant, that the defendant was only liable for ordinary or reasonable care to furnish its employees with reasonably safe and reliable machinery, were liable to confuse the jury, and present prejudicial error.                                                p. 68

It is the duty of an employee to avoid injury to himself. He must provide for his own safety from such dangers as are known to him or are discernible by ordinary care on his part.                                                            p. 66

A man was employed to unload into a scow an iron bucket full of cement, weighing some 6,000 pounds, let down by a hoisting engine; he was injured while standing under the bucket; some of his witnesses testified that he was not watching for it, but was looking out over the water; it was *held,* that he was guilty of contributory negligence.          p. 67

*Decided June 22nd, 1911.*

Appeal from the Circuit Court of Cecil County (PEARCE, C. J., ADKINS and HOOPER, JJ.).

The cause was argued before BOYD, C. J., BRISCOE, BURKE, URNER and STOCKBRIDGE, JJ.

*William H. Harlan* and *James J. Archer,* for the appellant.

*John S. Young* and *Albert Constable* (with whom were *Fahey & Brown,* on the brief), for the appellee.

STOCKBRIDGE, J., delivered the opinion of the Court.

This is an action to recover damages for personal injuries received by Joseph Mackin, the appellee, while acting as

Captain of a scow for the appellant, the Eyre-Shoemaker Construction Company.

The record presents a number of questions arising under twelve exceptions taken to rulings of the Court upon the admissibility of evidence, and one to the action of the Court upon the twenty-six prayers which were offered by the parties at the conclusion of the testimony; but in the view which we take of this case it will be sufficient to deal with only a few of them, those involving the application of the legal principles which govern all actions of this character.

At the conclusion of the entire evidence the defendant, by its first and second prayers, asked the Court to take the case from the jury, upon the ground of the lack of sufficient evidence. In this case, as in all other such cases, the foundation of the right to recover lies in some act of negligence, either of commission or omission on the part of the defendant, or its omission in the performance of some duty owed by it to the plaintiff.

What then are the facts as disclosed by the record tending to show the negligence of the defendant or its failure of duty? The Construction Company was engaged in building concrete piers on Watson's Island for the Baltimore and Ohio Railroad bridge across the Susquehanna river.

The materials used in construction were brought by rail to a place called Frenchtown, about one mile north of Perryville, and from there transported by scow to the Island. Mackin was employed by the Construction Company as Captain of the scow used for such transportatioan. The method of transferring the materials from the railroad to the scow was by means of a hoisting engine, which operated a derrick, and to this was attached a boom, passing over the end of the boom from the drum of the engine was a cable to which could be attached iron receptacles or buckets, into which the materials were loaded, and when so loaded the bucket was raised clear of the ground by means of the hoisting engine, swung over to the scow, lowered into the scow and unloaded. On the morning of the seventh of November, 1907, the scow

was taken to Frenchtown. The material to be transported consisted of cement in bags, each bag weighing approximately 100 pounds. As soon as the scow was made fast to the wharf Mackin proceeded to pump out the water which had collected in the bottom. The hoisting engine, which was what is known as a Mundy engine, was located some thirty-five or forty feet from the edge of the wharf, but between the engineer who operated it and the scow there was a pile of stone sufficiently high to render it impossible for the engineer, when at his post, to see a person on the scow, or for a person on the scow to see the engineer. Accordingly there was stationed at the end of the pile of stone a signal man, whose duty it was when the bucket had been loaded at the car to give the signal to the engineer to raise and swing the bucket around until over that portion of the scow where it was desired to have the load deposited, and then by a signal to direct the lowering of the bucket and the stopping of it for the purpose of unloading. The hoisting apparatus consisted of two drums, around one of which passed the end of the cable, and thence to the top of the boom, and on to the bucket. The revolutions of this drum were controlled by means of what was called the friction, that is, a cone composed of wood specially prepared, which by means of a lever was forced into the drum when it was desired to raise or hold a load, and released when the object was to lower the load; there was also on this particular engine a foot-brake, the purpose of which was to afford a means of still further checking the revolutions of the drum. It was also in evidence that this foot break was deemed as an extra part of the engine, and not always attached since the same end could be accomplished through means of the friction. The engine was provided with a gear guard, and there was some evidence to show that this gear guard was not in place upon the morning of the accident; that, however, may be disregarded for the reason that it does not appear from the evidence that the absence of the gear guard would in any way have affected or prevented the accident. The engine stood

and was operated in the open, without shed, covering or protection of any kind, either to the engine or any of its parts.

On the morning of November 7th, the scow was towed to the Frenchtown wharf, and some half hour was consumed after its arrival there in getting up steam in the boiler before work could be begun. A bucket had been left attached to the cable the night previously, and as soon as steam was gotten up, the bucket was raised from the ground where it lay, swung over to the car, where some thirty or thirty-five bags of cement were placed in it, and then swung around to the scow. The plaintiff was at the stern end of the scow, and as the bucket approached him it suddenly dropped, and swinging too far, struck the plaintiff, throwing him to the deck, and severely injuring him. The bucket was stopped by the engineer when about one foot above the deck, with the plaintiff pinned between the bucket and the deck.

Such being the salient facts it becomes pertinent to examine the evidence tending to establish negligence, and to ascertain whether such negligence was the negligence of the defendant Construction Company, or whether it was the negligence of a fellow servant. There is no question raised in the case as to the competency of the engineer. This differentiates the case at once from the case of *McCall's Ferry Power Company* v. *Price,* 108 Md. 96, where the evidence showed that the superintendent of the work had knowledge that the engineer was incompetent prior to the happening of the accident.

It is manifest that the place in which the plaintiff had his duties to perform was a dangerous place, inasmuch as there were required to be continually passing over the scow heavily laden buckets with loads of from 3,500 to 6,000 pounds, but this danger was open and obvious, and was, therefore, one of which the plaintiff must be treated as having assumed the risk, and for any injury resulting from danger of the place he has no claim against his employer;

*Gleason* v. *Suskin,* 110 Md. 141; *Harris* v. *Con. Coal Co.,* 111 Md. 225.

The type of engine used for the work was usual and appropriate for work of this description, the same that is used by many contractors. This was fully established by the evidence and was not attempted to be controverted. The engine was not new, but had been inspected by Mr. Bowles about two days before the accident, and found to be in proper shape, and there is nothing in the evidence to suggest that Mr. Bowles was not a competent inspector, he being the man who put the engine up, and whose duty it was to keep the machinery of the defendant company in proper condition. To entitle the plaintiff to recover in an action such as this, it is not sufficient to show that the plaintiff was injured from a defect in the machinery, but he must go further and establish the fact that the injury happened because the employer did not exercise proper care in the premises. *Buttner* v. *Steel Car Co.,* 101 Md. 168, 178.

Nor can it be held to constitute negligence *per se* upon the part of the employer that the engine was run exposed to the weather. *Dettering* v. *Levy,* 114 Md. 273. The testimony in the case is not only to the effect that engines of this type frequently are so run, but that they are built for the very purpose of being so run. The fact that they are sometimes enclosed or covered over either in whole or in part, cannot make it negligence to operate them in the open, something more than this must appear. There remain, then, three possible matters upon which negligence may be predicated, (1) the fact that the gear-guard was missing, and (2) that the foot-brake did not work, and (3) that by reason of a rain the night previous the friction was wet, and slipped or failed to hold.

With regard to the first of these, the fact that the gear guard was missing was disclosed in the testimony of Blose, the engineer; but he further testified "the gear-guard being off had nothing particular to do with the working of the engine," and the purpose of the gear-guard is explained in

the evidence of the witness Higgins, who was employed by the Mundy Co., which manufactured the engine and his evidence is to the effect that when the machinery "is idle the part of the friction that is used that goes into the cone is covered by the gear-guard." There is nothing, therefore, to show that the absence of the gear-guard on this particular engine had anything to do with the occurrence of the accident.

(2) The engineer Blose testified that the foot-brake wouldn't work on the first day when he tried it on loads, and that he "at once reported it to Mr. Bowes, who said he knew it wouldn't work, but no one repaired it." But the same witness further testified that at this time he did not apply the foot-brake at all, and be gives as his reason for not having attempted to apply it that "you can't depend on that at all.;" the evidence of the defendant showed conclusively that the brake was not deemed an integral part of the machine, but always an extra; that the control of the revolutions of the drum was had through the lever applied to the friction, and the other witnesses in the case corroborate this testimony, and it cannot be held to be negligence upon the part of an employer, where the servant does not even attempt to avail himself of the machinery and appliances provided for the greater safety of the employees, and the negligence, if negligence it was, upon the part of Blose in not applying the footbrake, was the negligence of a fellow servant of the plaintiff, and for that there can of course be no recovery as against the employer.

(3) The alleged negligence chiefly relied upon by the plaintiff consists of testimony tending to show that by reason of a rain the night previous, and a fog that morning the friction had become wet, and because of this condition slipped in the drum. The effect of this slipping, it was testified, would be to permit the drum to revolve more rapidly and then allow the cable and bucket attached to it to descend faster than when under the full control of the friction. The defendant offered evidence of a contradictory nature. There

was also testimony, uncontradicted, that there had been no slip of the friction when the bucket was first picked up that morning, or when after the cement had been placed in the bucket it was raised and swung over to where the scow lay. After the accident the bucket was raised some ten feet in the air, and held there by use of the friction for several minutes, and the engine continued to be operated in like manner for the balance of the day. The only time when any slip of the friction is claimed to have occurred on this day was the one time when the plaintiff was injured.

But before passing on the effect of the testimony given on behalf of the plaintiff to sustain the alleged slipping of the friction, there was another matter taking place at the same time which must be considered. This is an uncontradicted act of negligence which might have occasioned the accident equally with the slipping of the friction. As already stated, Blose, the engineer, could not from his position see a person on the deck of the scow, and, therefore, a signal man, Jacus, had been placed in a position where he could see both the engineer and the deck of the scow, and direct the movements of the engineer. Blose testified that after he had started the load from the car platform and swung it around "I eased the friction a little bit to cause the load to come down when I thought it was in the right position," and again, "Q. You didn't wait to get the signal from Mr. Jacus, but you undertook to lower it yourself? A. I used by own judgment." He further testified, that he was looking at the boom and that he did not know whether Jacus gave him any signal to lower the bucket or not. Mr. Jacus in his testimony testifies positively that he did not give any signal; that after the load had been swung around he turned towards the engineer for the purpose of giving such a signal, and then discovered that the engineer had already begun to lower, and continued to lower until Jacus observing the possible peril of the plaintiff, and that Blose, the engineer, was not paying attention to his signal, called to him to "hold it." The action of the engineer in lowering this load without signal from the man

·whose duty it was to give the signal, who had been placed there by the Construction Company for that purpose, was itself clearly an act of negligence, and it was the act of negligence of a fellow servant. In this condition, we have an accident which may have resulted from either one of two causes; one for which the defendant might be responsible, the other for which it could not be held responsible, and in such a case the rule of law is that laid down by CHIEF JUDGE McSHERRY, in *Harford County* v. *Wise,* 75 Md. 38, and re-affirmed in *Baltimore* v. *Schnitker,* 84 Md. 34 and *Darby Co.* v. *Hoffberger,* 111 Md. 84, "that where the evidence tends equally to support either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof. A verdict in favor of the party bound to maintain one of those propositions against the other is necessarily wrong."

It therefore follows that there was error in the rejection of the first prayer of the defendant.

The prayers of the defendant numbered 1½, 2¼ and 2½, all deal in varying phraseology with the doctrine of contributory negligence, and were all refused; but they may be properly considered together. To determine the question of contributory negligence in such a case, it must first be clearly understood what was the duty or obligation resting upon the plaintiff who was performing his duty in a manifestly dangerous place, and that duty has been tersely stated in *McGee* v. *Cuyler,* 112 Md. 321, as follows:

"It is the duty of the servant to exercise care to avoid injury to himself; he is under as great obligation to provide for his own safety from such dangers as are known to him, or are discernible by ordinary care upon his part, as the master is to provide for him. He must take ordinary care to learn the dangers which are likely to beset him in the service. He must not go blindly to his work where there is danger, he must inform himself; this is the law everywhere."

The evidence is uncontradicted that as the loaded bucket was swung from the shore over the scow at the end of the

cable passing over the boom, it had, either as the result of its momentum or by reason of the wind, an oscillation of its own which at times was as great as four feet; this fact was in itself an added element of danger for protection against which it was obligatory upon the plaintiff to be on his guard. What was the plaintiff doing to fulfill this obligation? According to his own testimony he was not looking at the bucket, but was standing looking out over the water, and he further testified that he paid no "attention to see which way the 'high-ball' (signal) man or the engineer was sending the bucket," and in this evidence he is corroborated by the witness Martin F. Abbott, a deck hand on the tug which was lying alongside of the scow; who testified that the plaintiff "was facing kinder catercorner, it looked to me like he was facing about the draw of the Pennsylvania Railroad bridge." This is the testimony on behalf of the plaintiff, and it shows the plaintiff to have failed in the exercise of the ordinary care required of him. One of the other witnesses, Jacus, placed him in a somewhat different position, that of attempting with his hands to direct the descent of the bucket, yet since that was no part of his duty, in either event the plaintiff was not fulfilling the obligation which rested on him to provide for his own safety, and was therefore guilty of contributory negligence, and the defendant's prayer No. 2¼ should have been granted.

In the ruling upon the prayers the Court granted the 4th prayer of the plaintiff, which was as follows: "That what is due care in furnishing machinery must be measured by the character and risk and exposures of the business and the degree of care required is higher where life or limb is in danger than in other cases." The 10th prayer of the defendant was also granted as follows: "The jury are instructed that in furnishing a hoisting machine for the work on the Frenchtown wharf and a place for its employees to do the work the defendant was not required to use the highest degree of care; but to use only ordinary or reasonable care to furnish its employees with a reasonably safe and suitable

machine and a reasonably safe and suitable place." By this last prayer the jury were instructed as to the measure of care which the plaintiff was entitled to receive from the defendant, and that it was "ordinary or reasonable care"; the fourth prayer of the plaintiff while very general in its terms, indicates to the jury that the plaintiff was entitled at the hands of the defendant under the circumstances in which he was employed to a "higher" degree of care. Higher than what, is not stated, but the conclusion is inevitable that it was a degree of care higher than ordinary care; the two instructions were therefore inconsistent with one another, and the granting of both must inevitably have tended to confuse the jury as to the measure or extent of care which the plaintiff was entitled to receive from the defendant. The granting of these two inconsistent instructions, therefore, was prejudicial error.

In view of what has been said it is unnecessary to discuss the other questions raised by the exceptions in this case, and for the reasons indicated the judgment below will be reversed without a new trial.

> *Judgment reversed without a new trial;*
> *costs to the appellant.*